# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EMPIRE MEDICAL REVIEW SERVICES, INC.,

        Plaintiff,

   v.                             **Case No. 13-CV-1283**

COMPUCLAIM, INC.,

        Defendant.

## DECISION AND ORDER

### 1. INTRODUCTION

Empire Medical Review Systems, Inc. develops and licenses medical billing software, including software called "ClearingMagic" (ECF No. 197, ¶¶ 2-3), which enables medical providers to submit claims for payment (ECF No. 197, ¶ 3). CompuClaim assists school districts with getting claims submitted to state Medicaid agencies for reimbursement. (ECF No. 197, ¶ 17.)

In 1996 Congress passed the Health Insurance Portability and Accountability Act (HIPAA). Pub.L. 104–191, 110 Stat. 1936; (ECF No. 197, ¶ 5.) Relevant here is Title II of HIPAA and its "Administrative Simplification" provisions. (*Id.*); *see also* 42 U.S.C. § 1320d – 1320d-8. Pursuant to Title II, the American National Standards Institute

(ANSI) promulgated certain uniform standards for the electronic representation of certain transactions (including financial transactions) within the healthcare industry. (ECF No. 197, ¶ 5.)

The industry was given until approximately 2003 to become compliant with the new requirements of HIPAA, including the new ANSI standards that were being developed for the electronic submission of claims for payment. (ECF No. 197, ¶ 6.) The advent of the requirement for ANSI claims submission, and the complexity of the ANSI standards, created a market and demand for translation software that would enable users to take output in their current formats and translate it into the new HIPAA required ANSI formats. (ECF No. 197, ¶ 7.)

In late 2005 and early 2006 Empire updated and modified its software "to take into account the new formatting requirements created by HIPAA and other programs." (ECF No. 197, ¶ 8.) In 2006 Empire began to refer to the product as ClearingMagic. (*Id.*) ClearingMagic is designed to work with other Empire software products, including its EligibilityMagic software, which it created in 2009 and which makes electronic queries of insurance eligibility. (ECF No. 197, ¶ 9.)

In 2010 CompuClaim approached Empire with its plan to create a website that would enable school districts to submit claims for payment to state Medicaid agencies. (ECF No. 197, ¶ 11.) In July 2010 CompuClaim and Empire entered into a Software License and Support Maintenance Agreement (hereafter referred to as the License

Agreement). (ECF No. 197, ¶ 12.) The License Agreement covered at least the ClearingMagic software; the parties dispute whether it covered other software, including EligibilityMagic. (ECF No. 197, ¶ 15.) Also in July 2010 the parties entered into an agreement entitled "CompuClaim Web Portal Discovery Proposal" whereby the parties agreed to explore what it would take to develop the sort of website CompuClaim envisioned. (ECF No. 197, ¶ 21.)

In September 2010 CompuClaim and Empire entered into a "Web Integration Agreement" (titled and hereafter referred to as "Addendum B"). (ECF No. 197, ¶ 28.) In simplistic terms, under Addendum B Empire agreed to create the source code (referred to here as the CMWebSite source code) necessary for CompuClaim's website (referred to here as MeduClaim). (ECF No. 197, ¶¶ 28-29.) Addendum B also extended the term of the License Agreement from three to five years. (ECF No. 197, ¶ 41.) However, CompuClaim ceased paying under the License Agreement after three years. (ECF No. 197, ¶ 158.)

To assist in the creation of the CMWebSite source code Empire hired Jeff Berg as an independent contractor. (ECF No. 191, ¶ 31.) Empire delivered the operable website to CompuClaim in early 2011. (ECF No. 197, ¶ 62.)

Sometime between February and August 2011 Berg began working as an independent contractor for CompuClaim. (ECF No. 191, ¶ 37.) Although working for CompuClaim, Berg continued to work out of Empire's offices until February 2012. (ECF

No. 197, ¶ 74.) When Berg ceased to work at Empire's offices an Empire employee, Scott Strommen, removed Empire software from Berg's computer. (ECF No. 191, ¶¶ 59-60.) However, Strommen did not remove the CMWebSite source code from Berg's computer. (ECF No. 191, ¶ 60.) Thus, Berg retained access to the CMWebSite source code and could modify it. (ECF No. 191, ¶¶ 41-42.)

At the time MeduClaim was created it was for the ANSI 4010 format, but in 2012 electronic claim submissions had to comply with a new format, ANSI 5010. (ECF Nos. 191, ¶ 52; 197, ¶¶ 108-10.) Empire charged CompuClaim for work to update the software to comply with the ANSI 5010 format (ECF No. 191, ¶ 54) in accordance with a provision of the License Agreement regarding providing custom programming. (ECF No. 197, ¶ 111). CompuClaim paid for the work (ECF No. 197, ¶ 123) but argues the update should have been included under the License Agreement as "software maintenance," which the License Agreement defines to include "[c]hanges to the software which are necessary as the result of changes in implementation guides published by centers for Medicare and Medicaid, CMS." (ECF No. 191, ¶ 53.) CompuClaim's customers began to experience problems with the software in January 2012, which CompuClaim attributes to problems in the ANSI 5010 update. (ECF No. 191, ¶ 55.)

After leaving Empire, Berg and a CompuClaim employee began to develop a replacement version of the website-related software, which CompuClaim launched in

August 2012. (ECF No. 197, ¶¶ 77-78.) This replacement version was developed using the CMWebSite source code as a starting point. (ECF No. 197, ¶ 81.) CompuClaim admits that it never stopped using the CMWebSite source code but contends that it owns that code. (ECF No. 197, ¶¶ 82, 85, 86-91.)

Empire filed this action on November 13, 2013, alleging that CompuClaim breached the License Agreement in a number of ways, including by not paying license fees after July 2013. (ECF No. 1.) Empire also sought a declaration that CompuClaim had breached its obligations under the License Agreement and has a continuing obligation to perform until the end of the agreement. (*Id.*) CompuClaim filed a number of counterclaims. (ECF No. 7.) It also sought declaratory relief, requesting that the court declare that Empire had materially breached its obligations under the parties' various agreements and that the agreements were terminated and CompuClaim was relieved of its obligations under them. (*Id.*)

On August 17, 2015, Empire applied for and subsequently received a copyright registration regarding the CMWebSite source code. (ECF No. 197, ¶ 68.) It then amended its complaint to add claims for copyright infringement and for violation of the Digital Millennium Copyright Act (DMCA). (ECF No. 60.) Because the five-year term of the license agreement had expired, Empire's amended complaint conceded that its request for declaratory relief was now moot. (*Id.*) In response, CompuClaim added more counterclaims. (ECF No. 63.)

On November 30, 2017, both parties moved for summary judgment. (ECF Nos. 162, 165.) Empire seeks summary judgment on its claims against CompuClaim as follows:

— CompuClaim infringed Empire copyright in the CMWebSite source code; and

— The length of the License Agreement is five (rather than three) years.

Empire also sought summary judgment on all of CompuClaim's counterclaims (except for the tortious interference claim) on the ground that they are barred by a release previously provided it by CompuClaim. It also sought dismissal of several of the counterclaims on other grounds. CompuClaim sought summary judgment on all three of Empire's remaining claims.

On June 6, 2018, the parties filed a Joint Notice of Settlement of Counterclaims. (ECF No. 213.) The notice states that the settlement is of CompuClaim's counterclaims only and that Empire's claims against CompuClaim remain pending. CompuClaim's counterclaims were formally dismissed by way of stipulation filed on June 18, 2018. (ECF No. 214.)

Briefing on the parties' motions is complete. All parties have consented to have this court enter final judgment. (ECF No. 52, 53.)

## 2. SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "Factual disputes are 'material' only when they 'might affect the outcome of the suit under the governing law'" and "'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [nonmovant].'" *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The burden on the moving party may be discharged by demonstrating 'that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## 3. ANALYSIS

### 3.1 Digital Millennium Copyright Act

The DMCA prohibits the unauthorized removal or alteration of any "copyright management information … knowing, or … having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under [Title 17 of the United States Code]." 17 U.S.C. § 1202(b)(1).

> [T]he term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:
> (1) The title and other information identifying the work, including the information set forth on a notice of copyright.

(2) The name of, and other identifying information about, the author of a work.

(3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(4) With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

(5) With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work.

(6) Terms and conditions for use of the work.

(7) Identifying numbers or symbols referring to such information or links to such information.

(8) Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

17 U.S.C. § 1202(c).

Functional units of the MeduClaim source code were organized into separate classes. (ECF No. 191, ¶¶ 69-72.) One such class was named:

ClaimsInInventoryQuery claimsInInventoryQuery = new
ClaimsInInventory EmpireMedical.CMWeb.GUI.Compuclaim.
MWService.ClaimInventoryMW[ ] claim selectedFilename,
selected835Filename)

(ECF No. 191, ¶ 70.) Berg, while employed by CompuClaim, changed this class name to "CMWeb.GUI.Compuclaim.MWService.ClaimInvencoryMW". (ECF No. 191, ¶ 71.)

Empire asserts that "EmpireMedical" refers to the name of the author of the copyrighted software. Therefore, it is copyright management information under 17 U.S.C. § 1202(c)(2). Empire alleges that each of the 149 instances on which Berg changed

the class name in the source code was an individual violation of the DMCA, subjecting CompuClaim to statutory damages "of not less than $ 2,500 or more than $25,000" for each violation. 17 U.S.C. § 1203(c)(3)(B); (*see* ECF No. 166 at 11-14 (all citations reflect the ECF pagination)).

In moving for summary judgment, CompuClaim argues that Empire has not named a single witness (fact or expert) that will testify what alleged copyright management information was removed. (ECF No. 166 at 12-13.) In addition, it argues that Empire has no witness that will testify that software code that was altered was, in fact, copyright management information. (ECF No. 166 at 13-17.) It also alleges that "EmpireMedical" is not even Empire's name; there is a separate, unrelated Oregon corporation called "Empire Medical." (ECF No. 166 at 15-16.)

With regard to Compuclaim's contention that Empire has no witnesses that will testify that the alleged copyright management information (i.e., references to EmpireMedical) was removed, Berg admits that he "removed the 'EmpireMedical' reference at the beginning of the class name" from the source code. (ECF No. 207, ¶¶ 1, 3.) And Empire employee Jereme Mills declares that "EmpireMedical" was removed from 148 different files, with one additional instance where CompuClaim removed "Empire Medical" from the source code. (ECF No. 207, ¶ 3.) This evidence precludes granting summary judgment for CompuClaim on the basis that Empire has no

witnesses that will testify as to what alleged copyright management information was removed.

As for CompuClaim's contention that Empire has no witness that will testify that the information removed by Berg was, indeed, copyright management information, CompuClaim asserts that the definition of copyright management information as including "the name of, and other identifying information about, the author of a work," requires more than just the name of the author; it requires the name of the author *and* "other identifying information" about the author. (ECF No. 206 at 4.)

CompuClaim does not cite to any authority supporting its reading of the statute. And the court disagrees with its reading. To read the provision identifying copyright management information as including "the name of, and other identifying information about, the author of a work" as protecting an author's name only if it is supplemented with "other identifying information about the author of the work" would be inconsistent with the policy and history underlying the DMCA whereby Congress sought broad and common-sense protection of copyrighted works. *See, e.g.*, *IQ Grp. v. Wiesner Publ'g, Inc.*, 409 F. Supp. 2d 587, 593-98 (D.N.J. 2006).

It is not clear what "other identifying information about the author of the work" might even be. Works commonly state only a title, an author, and the name of the copyright holder, unaccompanied by any other "information identifying the work" or "other identifying information about" the copyright holder or author. Thus, under

CompuClaim's reading of § 1202(c)(2), rather than broadly protecting copyrighted works, Congress protected works only in limited circumstances where creators add extraordinary information.

But the more reasonable reading—that § 1202(c)(2) protects both the name and other identifying information about the author, without requiring both to be included in the work—is consistent with Congress's goal of affording broad protection. The statute does not *require* that the name of the author be supplemented by "other identifying information about" the author before it can be considered to be copyright management information; it simply states that, *if* the author's name is supplemented by such other identifying information about the author, all of it is copyright management information.

Thus, although circumstances for its application might be unusual, the provision nonetheless stands to serve a valuable role in protecting the intellectual property of authors. For example, if an author were identified as "John Smith of Milwaukee, Wisconsin," it would be unlawful under § 1202(c)(2) for a different John Smith to delete "of Milwaukee, Wisconsin" or substitute his city and state if he had reasonable grounds to know it would enable him to claim he was the author of the work. Consequently, by also protecting "other identifying information about[] the author," Congress did not limit the DMCA to a very narrow class of works where creators include extraordinary information but rather afforded expansive protection not limited to simply the author's name.

In *Bounce Exch., Inc. v. Zeus Enter., Ltd.*, No. 15cv3268 (DLC), 2015 U.S. Dist. LEXIS 165073 (S.D.N.Y. Dec. 9, 2015), the plaintiff Bounce developed software that it alleged Zeus, who did business under the name Yieldify, unlawfully copied. *Id.* at *2-3. The court allowed Bounce to amend its complaint to add a DMCA claim on the basis of evidence that Zeus changed "bouncex" in Bounce's original software code to "yiel" and "yieldifyx" in Yieldify's allegedly infringing code. *Id.* at *3. The court concluded that references to an author within source code comes within the statutory definition of copyright management information because it is "conveyed in connection with" a copyright work, akin to an artist's signature on a canvas or a book's author appearing on the cover and other pages within a book. *Id.* at *6 (citing 17 U.S.C. § 1202(c)) (emphasis omitted).

The *Bounce* court rejected Zeus's argument that there must be a distinction between copyright management information and the body of the work. *Id.* at *8. In the *Bounce* court's view, that argument was inconsistent with the plain language of the statute. *Id.* The court found that including the author's name within the source code was especially appropriate given the nature of source code, which "is seldom seen by anyone but software developers." *Id.* at *7. "Weaving [copyright management information] into the text of the source code may be among the most efficient or security-enhancing ways to include [copyright management information] with that code." *Id.* The court also rejected the argument that the text was not copyright

management information because it did not refer to the author's full name. *Id.* at *9. It stated:

> Merely because these terms could be construed to refer to a different entity called "Bounce" or some permutation thereof, however, does not mean that the terms cannot qualify as [copyright management information] as a matter of law. Section 1202(c) states that [copyright management information] may consist of "[t]he name of … the author of a work"; it does not forbid using abbreviations or short-form versions of the author's name. The terms "bounce" and "bouncex" are sufficiently linked to the plaintiff's full corporate name to constitute [copyright management information].

*Id.* at *9-10.

Similarly, in *Iconics, Inc. v. Massaro*, 192 F. Supp. 3d 254, 272 (D. Mass. 2016), in denying the defendant's motion for summary judgment, the court concluded that the word "ico" in the source code was copyright management information because it referred to the author of the code, ICONICS, Inc.

The court finds the analysis in *Bounce* and *Iconics* persuasive. As such, the court is not prepared to find as a matter of law that no reasonable finder of fact could conclude that the references to EmpireMedical in the source code were copyright management information.

CompuClaim argues that, even if the term "EmpireMedical" in the source code was copyright management information, no reasonable finder of fact could conclude that the name was removed "knowing, or … having reasonable grounds to know, that it

will induce, enable, facilitate, or conceal an infringement of any right under [Title 17 of the United States Code]," 17 U.S.C. § 1202(b). (ECF No. 166 at 17.)

This, in the court's view, is a much closer question. CompuClaim argues:

Berg did not hide the fact that he was removing references to "EmpireMedical." In fact, he made a note in the log for the MeduClaimWeb 2.0 project, making clear to anyone that had access to the source code that he had removed references to "EmpireMedical" from the class names. [Empire] does not allege that copies of the source code were distributed to the public with references to EmpireMedical removed, and no one outside of the context of this litigation was given access to the altered class names within the software. The only impact of shortening the class name and removing text, including "EmpireMedical," was that it made the software more efficient and easier to modify in the future.

(ECF No. 166 at 18-19.) But CompuClaim does not support these factual assertions in its brief with any citation to a proposed finding of fact.

Citing to the declaration of Jereme Mills, Empire states that Berg's explanation for removing "EmpireMedical" from the code—to make it more efficient and easier to modify in the future—is pretextual because it did not result in any tangible improvement to the operation or efficiency of the code. (ECF No. 191, ¶ 72.) Empire also notes its expert reported that in July 2013 Berg edited the source code with the following comment: "Removal of all EmpireMedical references." (ECF No. 191, ¶ 73.) Both of these assertions are set forth in response to CompuClaim's proposed findings of fact rather than as additional proposed findings of fact. *See* Civ. L.R. 56(b)(2)(B)(ii). As CompuClaim correctly points out (ECF No. 207 at 1), that is not a proper way to

introduce a new factual assertion because it denied CompuClaim the opportunity to state whether it agreed or disagreed and to submit evidence in support of its position.

Thus, neither party has properly put before the court evidence that demonstrates whether CompuClaim made the change without the requisite knowledge. But even if the court were to consider the apparently undisputed (although improperly presented) fact that Berg explicitly noted that he was removing the references to "EmpireMedical" in the source code, the court would conclude it must still deny CompuClaim's motion for summary judgment. The record is insufficient to enable the court to conclude that recording the change in a change log necessarily demonstrates a lack of knowledge that the removal of "EmpireMedical" in the class name would "induce, enable, facilitate, or conceal an infringement of any right" under the United States copyright law. For example, the court is not told whether the change log is accessible to anyone reviewing the source code.

In sum, the court finds that it must deny CompuClaim's motion for summary judgment with respect to Empire's DMCA claim. A genuine dispute of material fact exists both as to whether the reference to "EmpireMedical" in a class name within the source code is copyright management information and as to whether the removal was done with the requisite knowledge.

### 3.2 Copyright Infringement

Both parties move for summary judgment on Empire's contention that CompuClaim infringed on Empire's copyright regarding the CMWebSite source code.

#### 3.2.1 CompuClaim's Motion

This action is not the first dispute between Empire and CompuClaim. On April 16, 2012, CompuClaim and Empire entered into a settlement and mutual release agreement regarding a prior dispute. (ECF No. 168-8.) In the settlement agreement CompuClaim released Empire "from all actions, claims or causes of action … that [CompuClaim has] now, or in the future may have, against [Empire] arising out of events occurring prior to the execution of this Agreement. Nothing in this section, however, should be construed as a release by [CompuClaim] of any claims for … (a) a breach of this Agreement; (b) a breach of the obligations evidenced by the Note; or (c) a breach after the date of this Agreement of the ClearingMagic Software License and Support and Maintenance Services Agreement between Empire and [CompuClaim] dated July 13, 2010 …." (ECF No. 168-8, ¶ 4.)

Empire, in turn, released CompuClaim "from all actions, claims or causes of action … that [Empire] … [has] now, or in the future may have, against [CompuClaim], arising out of events occurring prior to the execution of this Agreement. Nothing in this section, however, should be construed as a release by Empire … of any claims for a breach of this Agreement." (ECF No. 168-8, ¶ 5.)

"It is a well–settled principle in the law that compromises of disputes are favored. When such a compromise is put into writing as a final settlement of a dispute, it will be upheld by the courts as written, if the intent of the parties is clearly disclosed in such agreement." *Schilling v. Milwaukee Bedding Co.*, 197 Wis. 250, 221 N.W. 743, 746 (1928). "Issues regarding the formation, construction, and enforceability of a settlement agreement are governed by local contract law." *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000) (citing *Carr v. Runyan*, 89 F.3d 327 (7th Cir.1996)). Thus, the court assesses the meaning of the parties' settlement agreement in light of Wisconsin contract law. *See Hart v. Artisan & Truckers Cas. Co.*, 2017 WI App 45, ¶11, 377 Wis. 2d 177, 900 N.W.2d 610.

In moving for summary judgment, CompuClaim argues that Empire's copyright claim is barred by the settlement agreement's release because it arises out of events occurring prior to the execution of the Settlement Agreement. Specifically, it argues that the "event" that the claim "arises out of" is Berg's departure from Empire's offices in February 2012, when he was allowed to retain the custom programming regarding the MeduClaim website. (ECF No. 166 at 23.) It points out that Empire alleges that its damages started on April 17, 2012, the day after the release. (ECF No. 166 at 21.) Because no new event happened on April 17, 2012, CompuClaim argues that this means that Empire's copyright claim necessarily existed before the release and is therefore barred. (ECF No. 166 at 21.)

In response to CompuClaim's motion, Empire contends that it is only advancing claims arising after the date of the settlement agreement—that is, after April 16, 2012. (ECF No. 190 at 10.) Empire argues that its copyright claim is based on acts of infringement occurring after the release date—namely, CompuClaim copying and creating derivative works from Empire's software. (ECF No. 190 at 13-14.) Empire says that Berg's access to the Empire source code is not the act of infringement that it sues on in this lawsuit. (ECF No. 190 at 14.)

Berg retaining the code might have been a link in the causal chain that led to Empire's copyright claim, but it was not an event that could be fairly said to have given rise to the claim. Simply because a party has the means of committing an unlawful act does not give rise to a claim. Therefore, the court rejects CompuClaim's argument that Empire's copyright claim is necessarily barred by the release.

The fact that Empire asked its damages expert to use April 17, 2012, as the start date for calculating damages does not establish that the event that triggered the copyright infringement claim was Berg's departure in February 2012. (*See* ECF No. 166 at 122; ECF No. 191, ¶ 75.) That merely represents a best-case-scenario assumption offered to assist an expert in shaping his opinion; it is not a concession or a statement that precludes Empire from proving at trial that the damages began to accrue at a later date as a result of copyright infringement occurring sometime after April 17, 2012.

Consequently, the court concludes that CompuClaim has failed to show that Empire's copyright infringement claim was released by the April 16, 2012 mutual release.

### 3.2.2 Empire's Motion

"A copyright 'vests initially in the author or authors of the work.'" *Billy-Bob Teeth v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003) (quoting 17 U.S.C. § 201). But like other property, a copyright can be transferred. *Id.* "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).

In moving for summary judgment on its copyright claim, Empire contends that "[s]ummary judgment is required here because there is absolutely no such writing in which [Empire] assigned ownership of any copyright to CompuClaim." (ECF No. 173 at 12.) To the contrary, the License Agreement demonstrates that Empire merely intended to provide CompuClaim with a limited license. (ECF No. 173 at 12.) It also argues that there is no dispute that CompuClaim then copied constituent elements of the CMWebSite source code. (ECF No. 173 at 15-19.)

### 3.2.2.1 Assignment of Custom Programming

CompuClaim argues that the License Agreement is a written transfer of copyright ownership. It argues that the License Agreement "gives CompuClaim the

rights to all custom programming that is added onto the licensed Software." (ECF No. 166 at 26.) CompuClaim acknowledges that the License Agreement is clear that Empire retains all copyrights to "the Software," but notes that "the Software" is defined simply as "ClearingMagic." (ECF No. 196 at 2-3; 168-1, A; *but see* ECF No. 168-1, 1(a) (defining "Software" as "the Software and related documentation".) According to CompuClaim, the distinction between the Software and the additional custom programming is underscored by the fact that custom programming and the Software are addressed separately in the License Agreement. Under the License Agreement,

> Licensee may create custom features, options or reports which are to be added to the Software (hereinafter "add-ons") but only for Licensee's use in its business and not for sale or resale to others. Add-ons created by Licensee shall be the property of Licensee, and Empire shall only use or disclose to any third party any add-on with the prior written consent of Licensee.

(ECF No. 168-1 § 1(f)(i).)

Empire disagrees that this provision of the License Agreement covers the CMWebSite source code. First, it notes that the website source code was not created by CompuClaim; the record is undisputed that Empire created the source code. Second, the website source code does not constitute an "add-on" under this section.

According to CompuClaim, the fact that it paid Empire for the custom programming work is enough to make it an "[a]dd-on[] created by Licensee." It asserts, "The Licensing Agreement does not differentiate between add-ons created by

CompuClaim by paying their own employees to code the add-ons, and add-ons created by CompuClaim by paying [Empire] to code the add-ons." (ECF No. 166 at 28.)

There is some flexibility as to the specificity required in the written transfer. *See, e.g., ITOFCA, Inc. v. Mega Trans Logistics, Inc.*, 322 F.3d 928, 931 (7th Cir. 2003) (rejecting argument that writing must refer to "copyright" and concluding that "all assets" covers copyright; *see also, generally*, 3 Nimmer on Copyright § 10.03[A][2] (2018). But a copyright agreement is a contract. As such, general principles of contract construction are generally applied in assessing an alleged transfer of a copyright. *See Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999).

The court concludes that the provision in the License Agreement—"Add-ons created by Licensee shall be the property of Licensee"—did not transfer to CompuClaim the copyright regarding the CMWebSite source code. For present purposes, the court accepts that the website source code constituted an "add-on" within the scope of the License Agreement and that it was distinct from "the Software" as defined in that agreement. Nonetheless, the provision is clear that it applies only to add-ons created by CompuClaim. Although CompuClaim tries to evade this caveat by contending that "created by" encompasses works CompuClaim paid someone else to create for it, the court rejects this argument as incompatible with a plain reading of the provision. At best the provision is silent as to add-ons created by Empire or third-parties. Such silence cannot constitute the clarity required for a transfer under § 204(a). *See Woods v. Resnick,*

725 F. Supp. 2d 809, 826 (W.D. Wis. 2010) (citing *Weinstein Co. v. Smokewood Entertainment Group, LLC*, 664 F. Supp. 2d 332, 342 (S.D. N.Y. 2009)).

CompuClaim points only to § 1(f)(i) of the License Agreement to support its contention that Empire transferred the copyright in the CMWebSite source code to CompuClaim. The court concludes as a matter of law that this provision did not transfer Empire's copyright in the CMWebSite source code to CompuClaim. However, that does not necessarily mean that Empire prevails on its copyright infringement claim. CompuClaim's actions may have been lawful under a nonexclusive license.

### 3.2.2.2 License

A preliminary issue is whether, as Empire argues, CompuClaim waived, or forfeited, its right to assert that it was given an implied license by not raising it as an affirmative defense in its answer. Because discovery is closed, Empire argues that it "had no opportunity or need to prepare to respond to a license defense." (ECF No. 190 at 25.)

CompuClaim responds that one court characterized an implied license as a "negative" rather than affirmative defense in a copyright infringement action, going so far as to strike the implied license affirmative defense from a defendant's answer. (ECF No. 206 at 17 (citing *Stevens v. Corelogic, Inc.*, 2015 WL 7272222, at *4 (S.D. Cal. Nov. 17, 2015)).) CompuClaim argues that, even if the court were to conclude that implied license is an affirmative defense and should have been alleged in its answer, forfeiture

should be found only if Empire was prejudiced by the omission. (ECF No. 206 at 17-18.) CompuClaim notes that Empire "does not claim that it would have taken any additional discovery if this affirmative defense had been raised, or it would have introduced any different or additional facts if this defense had been raised." (ECF No. 206 at 18.)

The court finds that an implied license is an affirmative defense that CompuClaim should have raised in its answer. Notwithstanding the contrary conclusion of the court in *Stevens*, the court finds that Rule 8(c)(1) and controlling case law of the Court of Appeals for the Seventh Circuit to be clear on this point. "[T]he existence of a license, express or implied, is an affirmative defense to a claim of copyright infringement." *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 761 (7th Cir. 2016), cert. denied, 137 S. Ct. 681, 196 L. Ed. 2d 528 (2017) (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)); *see also* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including … license …."). Indeed, CompuClaim acknowledges as much when, in opposing Empire's motion, it quotes the above statement from *Shaver* that "the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement." (ECF No. 196 at 7.) Although CompuClaim has filed three answers over the course of this litigation (ECF Nos. 7, 63, 131), it never alleged the affirmative defense of implied license. In the operative answer filed on June 12, 2017,

CompuClaim offered 17 separate affirmative defenses. Implied license was not one of them.

Nonetheless, finding forfeiture would be inappropriate. Although Empire alleges that, because CompuClaim did not raise implied license as an affirmative defense, it has not had a chance to engage in discovery related to whether it had an implied license, it has not explained what specific discovery it would have done. Its vague assertion that it has been deprived of an opportunity to respond to a license defense does not demonstrate that it was prejudiced by CompuClaim's failure. *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014) ("We will generally find that '[t]he failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it.'") (quoting *Matthews v. Wis. Energy Corp., Inc.*, 642 F.3d 565, 570 (7th Cir. 2011)); *see also Myers v. Harold*, 279 F. Supp. 3d 778, 794 (N.D. Ill. 2017) (rejecting forfeiture argument stating, "Plaintiff responded to Defendants' license arguments in their response to Defendants' summary judgment motion, and their reply in favor of their own motion. Because Plaintiff was able to respond, the court will address this defense.").

Thus, the court will consider the merits of CompuClaim's license argument. However, the nature of this argument is often unclear, at least insofar as CompuClaim may be alleging that it possesses an express license. CompuClaim opens its brief in support of its motion for summary judgment with this sentence: "CompuClaim, Inc. is

the target of a Digital Millennium Copyright Act ("DMCA") claim that is unsupported by any evidence or testimony, is the target of multiple claims that were settled and released years ago, and is the target of one copyright claim over a work that it purchased *and has both an express and an implied license to use*, and two other copyright claims over unprotectable material." (ECF No. 166 at 2 (emphasis added).) Later, it asserts, "Under both the express language in the Licensing Agreement and the standards for an implied license, CompuClaim has a right to all custom programming added onto the ClearingMagic Software." (ECF No. 166 at 3.) Similarly, it argues, "However, if the Court does not find the Settlement Agreement bars EMRS's copyright claim, the undisputed facts show that CompuClaim purchased the custom programming that is the basis for the vast majority of CompuClaim's [sic] copyright claims, and has a license to use the custom programming based on the express language in the Licensing Agreement and the standards for an implied license." (ECF No. 166 at 25.) Finally, CompuClaim alleges that "EMRS provided CompuClaim with and [sic] express and an implied license for the custom programing." (ECF No. 166 at 11.)

However, beyond these assertions, CompuClaim never explains why it believes it obtained an express license regarding the custom programming. As quoted above, CompuClaim seems to suggest that its express license emerges from the License Agreement. But it does not develop this argument, leaving the court to speculate as to its basis. If there were an express license with respect to the custom programming, the

court would suspect it to be found in the parties' agreement with respect to the CMWebSite source code, which was set forth in a document entitled "Addendum B," "CompuClaim ClearingMagic/EligibilityMagic Web Integration Project." (ECF No. 168-1 at 23.) But, CompuClaim argues (by way of an inappropriate footnote, *cf. United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (argument raised in passing in a footnote deemed waived)) (ECF No. 196 at 10, fn. 4)), that the agreement governing the website source code (Addendum B) is not part of  the License Agreement. If Addendum B, covering the custom website programming, is not part of the License Agreement, it is unclear how the License Agreement would grant CompuClaim an express license as to that custom programming. If CompuClaim's express license argument is simply that the copyright was assigned to it by virtue of the License Agreement, it fails as discussed above. Therefore, the court finds that CompuClaim has failed to demonstrate that it is entitled to summary judgment on the basis that it had an express license with respect to the custom programming.

As to the merits of CompuClaim's implied license argument, Empire's position is that the parties entered into an express license, memorialized in the License Agreement, which "precludes finding an implied license between the parties." (ECF No. 204 at 6.) The court does not agree that the fact that the parties had an express license agreement as to ClearingMagic necessarily forecloses the possibility that Empire gave CompuClaim an implied license to use the CMWebSite source code.

An implied nonexclusive license need not be written. *I.A.E.*, 74 F.3d at 775. In fact, it may be found through oral statements or even implied from conduct. *Id.* (quoting Melville B. Nimmer & David Nimmer, 3 Nimmer § 10.03[A] at 10-40.1). "[I]n the case of an implied nonexclusive license, the licensor-creator of the work, by granting an implied nonexclusive license, does not transfer ownership of the copyright to the licensee. The copyright owner simply permits the use of a copyrighted work in a particular manner." *Id.*

"[A]n implied nonexclusive license has been granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Id.* at 776 (citing *Effects Assocs. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990)). "[S]everal objective factors … guide the judicial inquiry as to whether an implied license exists: the language of the copyright registration certificate … and deposition testimony; and the delivery of the copyrighted material without warning that its further use would constitute copyright infringement." *Id.* (citing *Effects*, 908 F.2d at 559 n.6).

The court has already determined that Empire did not transfer the copyright to the CMWebSite source code to CompuClaim. And if the website source code was outside the scope of the License Agreement, what was CompuClaim's basis for using the website source code? But not even Empire argues that CompuClaim was somehow

barred from using the CMWebSite source code for any purpose. Thus, in the absence of a transfer of the copyright or an explicit license, CompuClaim necessarily had an implied license to use the CMWebSite source code.

But simply because CompuClaim had an implied license to use the CMWebSite source code in a certain way does not necessarily mean that it could use the software however it saw fit. *See Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984) (citing *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 19–21 (2d Cir.1976); *see also Pytka v. Van Alen*, No. CIV. A. 92-1610, 1992 WL 199833, at *4 (E.D. Pa. Aug. 11, 1992) ("the scope of any implied license would be a jury question and not for the Court to decide on summary judgment"); *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 838 (9th Cir. 2001) (Kozinski, concurring) ("Finding there was an implied license does not end the inquiry, however. We must also ask what the scope of this license was, and whether GenCom exceeded it."); *cf. Gracen v. Bradford Exch.*, 698 F.2d 300, 303 (7th Cir. 1983) ("We do not say she actually had the right, but only that there is a genuine issue of material fact concerning the scope of her implied license to make a derivative work."); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) (citing *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C.Cir.2003) ("Implied licenses may be limited and a defendant who exceeds the scope of an implied license commits copyright infringement.").

As with an express license, there may be limitations as to the scope of an implied license. Thus, a factual dispute exists as to the scope of any implied license given to

CompuClaim for the use of the CMWebSite source code, precluding the court from granting summary judgment in CompuClaim's favor with respect to this affirmative defense or in Empire's favor with respect to its copyright infringement claim.

### 3.3 Breach of Contract

As with Empire's copyright claim, CompuClaim argues that Empire's breach of contract claim is barred by the settlement agreement's release because it arises out of events occurring prior to the execution of the settlement agreement. CompuClaim alleges that, although CompuClaim reserved a cause of action for breach of the license agreement, Empire did not. The settlement agreement included a standard integration clause: "This Agreement shall form the entire agreement among the parties and shall supersede all prior negotiations, representations or agreements, either written or oral, unless expressly incorporated herein." (ECF No. 168-8, ¶ 20.) In light of this provision, CompuClaim argues that the settlement agreement superseded any prior agreement between the parties. As such, Empire released CompuClaim of all claims, including a claim for breach of the License Agreement, arising out of events that occurred prior to April 26, 2012.

Empire argues that each failure to perform under the License Agreement (which it contends was not extinguished by the settlement agreement) after the date of the settlement agreement gave rise to a new breach of contract claim. "Because CompuClaim had a continuing duty to perform its obligations (e.g., paying monthly

royalty payments) under the Software License Agreement after the date of the Mutual Release, each failure by CompuClaim to perform its obligations after that date constitutes a new claim as to each separate breach." (ECF No. 190 at 14-15.)

Empire acknowledges that the mutual release expressly refers to the License Agreement. (ECF No. 190 at 16.) However, it does so only in the context of CompuClaim's reservation of claims against Empire. (ECF No. 168-8, ¶ 4.) Thus, at a minimum an ambiguity exists as to whether the License Agreement as a whole survives the release's integration clause or whether only Empire has continuing obligations under the License Agreement.

Neither party much develops its argument on this point. But the parties' undisputed post-release conduct supports the view that the parties intended the License Agreement to continue to impose mutual obligations. For example, CompuClaim continued to pay licensing fees to Empire, which is inconsistent with the notion that, by virtue of the settlement agreement, CompuClaim was relieved of its obligations under the License Agreement.

Therefore, the court concludes that CompuClaim is not entitled to summary judgment on Empire's breach of contract claim.

### 3.4    Length of the Agreement

Empire sought summary judgment that Addendum B extended the term of the License Agreement from three to five years. (ECF No. 173 at 19-22.) CompuClaim does

not dispute that point. (ECF Nos. 196 at 10; 197, ¶ 41.) Because there is no dispute of material fact that Addendum B extended the duration of the License Agreement from three to five years, Empire is entitled to summary judgment in its favor on this point.

### 3.5 Copyrightable Elements

"In cases involving computer software, many courts analyze infringement with the 'abstraction-filtration-comparison' [(AFC)] approach first described in *Computer Associates International, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992)." *Datacarrier S.A. v. Woccu Servs. Grp.*, No. 16-cv-122-jdp, 2018 U.S. Dist. LEXIS 50299, at *16 (W.D. Wis. Mar. 27, 2018) (citing Melville B. Nimmer, Nimmer on Copyright § 13.09 (Matthew Bender ed. 2005) (the abstraction-filtration-comparison is the "dominant, albeit not universal, standard"). "This methodology jettisons extraneous unprotected elements of software until only the core protected material remains. This distilled 'golden nugget' is what is protected by the copyright laws." *Nikish Software Corp. v. Manatron, Inc.*, No. 1:07-cv-0358-TWP-DML, 2010 U.S. Dist. LEXIS 130567, at *14-15 (S.D. Ind. Dec. 8, 2010) (quoting *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir. 1992).

Empire alleges that CompuClaim infringed its copyright with respect to the "SendMail" function and table headings. CompuClaim argues that it is entitled to summary judgment on these claims because Empire's expert failed to apply the abstraction-filtration-comparison (AFC) test to consider whether these elements were subject to copyright. It notes that in *Macro Niche Software, Inc. v. 4 Imaging Sols., L.L.C.*,

No. CV H-12-2293, 2013 WL 12140417, at *5 (S.D. Tex. Dec. 18, 2013), the court held that, if the plaintiff fails to perform the AFC analysis, the defendant is entitled to summary judgment. *Id.* (citing *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 144 (5th Cir. 2004)).

However, as Empire points out in response, the AFC test is a means for assessing infringement of the non-literal aspects of software, *e.g.*, "the architecture, structure, sequence, organization, operational modules, user interface, and screen displays," as opposed to the literal elements, "which are the source code and object code." *Macro Niche Software*, 2013 WL 12140417, at *5 (S.D. Tex. Dec. 18, 2013); *see also, e.g., Comput. Assocs. Int'l v. Altai*, 982 F.2d 693, 706 (2d Cir. 1992) (discussing the application of AFC test to non-literal elements); *Comput. Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 694 (N.D. Ill. 2004) (same); *but see Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 143 (5th Cir. 2004) (noting the absence of controlling authority as to whether the AFC test could be applied to literal elements but finding it unnecessary to address the issue). CompuClaim in its reply addresses this argument only in a footnote (again, never a proper way to address an argument, *cf. Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009)), stating merely, "Rather than reargue the same points raised in its prior brief, CompuClaim simply stands on the arguments in its opening brief." (ECF No. 206, fn. 1.) But CompuClaim never addressed Empire's specific point in its initial brief.

The court agrees with the Court of Appeals for the First Circuit when it observed that, although the AFC "test may provide a useful framework for assessing the alleged

nonliteral copying of computer code," it is of little help and in fact may be misleading when applied to claims of infringement of literal elements. *Lotus Dev. Corp. v. Borland Int'l*, 49 F.3d 807, 815 (1st Cir. 1995). Consequently, with regard to Empire's claim that CompuClaim infringed the literal elements of Empire's copyrighted work, Empire was not required to support this claim with expert evidence regarding the application of the AFC test. Accordingly, CompuClaim is not entitled to summary judgment regarding this aspect of Empire's claim.

### 4. CONCLUSION

Aside from Empire's assertion that Addendum B extended the license agreement from three to five years, which CompuClaim concedes, the court finds it must deny the parties' motions for summary judgment. Factual disputes exist as to whether "EmpireMedical" in the CMWebsite source code was copyright management information and, if so, whether Berg removed it "knowing, or … having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under [Title 17 of the United States Code]," 17 U.S.C. § 1202(b). Therefore, summary judgment in CompuClaim's favor is not appropriate with respect to Empire's DMCA claim.

CompuClaim has failed to show that Empire released its present copyright or breach of contract claims by virtue of the April 16, 2012 settlement and mutual release. Although the court agrees with Empire that the License Agreement did not transfer to

CompuClaim ownership of the copyright in the CMWebSite source code, Empire is not entitled to summary judgment on its copyright claim because there exists a dispute of material fact as to whether CompuClaim's alleged infringement was authorized under an implied license. Nor is CompuClaim entitled to summary judgment on account of Empire's expert having failed to use the abstraction-filtration-comparison test to assess Empire's copyright claim.

**IT IS THEREFORE ORDERED** that the parties' stipulated motion to dismiss CompuClaim's counterclaims (ECF No. 214) is **granted**. Accordingly, Empire's motion for summary judgment with respect to CompuClaim's counterclaims is moot.

**IT IS FURTHER ORDERED** that Empire's motion for summary judgment (ECF No. 162) is **granted in part and denied in part**. It is granted as unopposed with respect to the duration of the License Agreement. Addendum B extended the original term of three years to a term of five years. It is denied as to all of Empire's other claims against CompuClaim.

**IT IS FURTHER ORDERED** that CompuClaim's motion for summary judgment (ECF No. 165) is **denied.**

Dated at Milwaukee, Wisconsin this 26th day of June, 2018.

WILLIAM E. DUFFIN
U.S. Magistrate Judge